**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2190
_____

PAUL SATTERFIELD,
Appellant

v.

DISTRICT ATTORNEY PHILADELPHIA;
ATTORNEY GENERAL PENNSYLVANIA;
SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-02-cv-00448)
District Judge: Hon. Jan E. DuBois
_____

Argued March 27, 2017
_____

Before: AMBRO, VANASKIE, and RESTREPO, *Circuit
Judges*

(Opinion Filed: September 26, 2017)

Aren K. Adjoian, Esq.     [Argued]
Arianna J. Freeman, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant Paul Satterfield*

Susan E. Affronti, Esq.
Simran Dhillon, Esq.     [Argued]
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
        *Counsel for Appellees District Attorney of
Philadelphia, Attorney General of Pennsylvania, and
Secretary of the Pennsylvania Department of Corrections*

————————————

OPINION OF THE COURT
————————————

VANASKIE, *Circuit Judge.*

Society views the conviction of an innocent person as perhaps the most grievous mistake our judicial system can commit. Reflecting the gravity of such an affront to liberty, the "fundamental miscarriage of justice" exception has evolved to allow habeas corpus petitioners to litigate their constitutional claims despite certain procedural bars if the petitioner can make a credible showing of actual innocence. In

2013, the Supreme Court's decision in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), extended this doctrine to allow petitioners who can make this showing to overcome the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations.[1]  In doing so, the Supreme Court recognized that an untimely petition should not prevent a petitioner who can adequately demonstrate his actual innocence from pursuing his claims.  This view reflects society's value judgment that procedure should yield to substance when actual innocence is at stake.

Despite repeatedly asserting his innocence, Appellant Paul Satterfield was convicted of first degree murder in 1985 and sentenced to life in prison.  After many years of direct and collateral litigation, he appeared to emerge victorious when the District Court, acting on his habeas petition, found that his ineffective assistance of counsel claim was meritorious.  But Satterfield's hopes for relief were short-lived, as we reversed the order granting habeas relief after finding that his petition was barred by AEDPA's statute of limitations.  Satterfield's fight was revived several years later when the Supreme Court handed down its decision in *McQuiggin*.  Had this decision been earlier, Satterfield had more solid support to pursue his ineffective assistance of counsel claim in spite of his untimely petition.  In *McQuiggin*'s wake, Satterfield sought relief from the judgment denying his habeas petition, characterizing

---

[1] AEDPA, 110 Stat. 1214, states that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).

*McQuiggin*'s change in relevant decisional law as an extraordinary circumstance to justify relief under Federal Rule of Civil Procedure 60(b)(6).

The District Court denied Satterfield's Rule 60(b)(6) motion after determining that *McQuiggin* was not an extraordinary circumstance. While we do not opine whether the Rule 60(b)(6) motion should ultimately be granted, we will nonetheless vacate the District Court's order. In *Cox v. Horn*, 757 F.3d 113 (3d. Cir. 2014), we held that changes in decisional law may—when paired with certain circumstances—justify Rule 60(b)(6) relief. A district court addressing a Rule 60(b)(6) motion premised on a change in decisional law must examine the full panoply of equitable circumstances in the particular case before rendering a decision. In this case, we believe that the District Court did not articulate the requisite equitable analysis, and we will remand for proper consideration.

Separately, and perhaps more importantly, we explain that the nature of the change in decisional law must be weighed appropriately in the analysis of pertinent equitable factors. *McQuiggin* implicates the foundational principle of avoiding the conviction of an innocent man and attempts to prevent such a mistake through the fundamental miscarriage of justice exception. If Satterfield can make the required credible showing of actual innocence to avail himself of the fundamental miscarriage of justice exception had *McQuiggin* been decided when his petition was dismissed, equitable analysis would weigh heavily in favor of deeming *McQuiggin*'s change in law, as applied to Satterfield's case, an exceptional circumstance justifying Rule 60(b)(6) relief. While Satterfield's ability to show actual innocence is not case determinative in that the District Court must weigh all of the

4

equitable factors as guided by precedent, we clarify that the nature of the change in law cannot be divorced from that analysis.

**I.**

The tortuous path to Satterfield's current appeal begins more than three decades ago. In 1983, Satterfield visited the home of Azzizah Abdullah to repair her television set. When Satterfield had finished and the television appeared to be working properly, Abdullah paid Satterfield's fee. But the television ceased working only a short while later, prompting Abdullah to summon Satterfield back to her home to complete the task. He made several additional attempts to fix the recalcitrant television, but his efforts were in vain. During Satterfield's final service call to Abdullah's home, her husband William Bryant became frustrated with Satterfield's repeated failures. Conflict erupted. When Bryant demanded Abdullah's money back while brandishing a knife and a baseball bat,[2] Satterfield returned the money and quickly departed, never reporting the incident to the police.

Approximately one week after the altercation in Abdullah's home, Bryant was shot outside his home in the early morning hours. Police interviewed two eyewitnesses—

---

[2] There are three versions of this event: (1) Satterfield testified that Bryant poked him with the baseball bat, (J.A. 544); (2) Wayne Edwards claimed that Satterfield told him Bryant had struck him with the bat, (J.A. 488); and (3) Abdullah explained that Bryant had nudged Satterfield's shoulder with the bat, (J.A. 465).

5

brothers Eric and Grady Freeman—on the morning of Bryant's murder. The Freemans had been in their home at the time of the shooting and, upon hearing the gunshots, peered out from their windows at the crime scene. Eric Freeman reportedly saw a man who "looked like he was white," "had like blond hair," and was about 5' 9".[3] (J.A. 695–97.) According to Eric, the man briskly walked to a parked car, looked both ways before getting in, and had his hand inside his jacket "like he was putting away something." (J.A. 695–97.) Grady Freeman similarly described seeing a "light skin guy" about 5'7" or 8". (J.A. 698.) Critically, Satterfield is a black man with brown hair and stands six feet tall. (J.A. 439.)

Investigators soon learned of Satterfield's recent altercation with Bryant. This information yielded a search warrant for Satterfield's home and car. Upon execution, however, the searches produced no evidence implicating Satterfield, and the investigation went dormant for about a year.

The story picks back up in 1984, when Satterfield met Patricia Edwards at a nearby racquet club. Mrs. Edwards suggested that Satterfield play tennis with her husband, Wayne Edwards. After playing together on several occasions, Satterfield and Mr. Edwards met for lunch at the racquet club. The conversation began with benign pleasantries, with the two discussing commonalities in their upbringings, among other things. Mr. Edwards claimed that the conversation eventually culminated with Satterfield admitting to Bryant's murder in

---

[3] Both brothers also described the shooter has having closely cropped hair, while Satterfield was said to have had a bushy Afro of a brown or reddish color. (J.A. 436, 614.)

fairly explicit detail. Mr. Edwards contacted the police through his attorney, and Satterfield was arrested days later.

At Satterfield's trial, Mr. Edwards testified to Satterfield's confession. The State Respondents characterize Mr. Edwards' testimony on the stand as both credible and corroborated by the evidence. Mr. Edwards told the jury that Satterfield had not reported his altercation with Bryant to the police because he assumed it would be futile based on a past experience with a customer. Mr. Edwards also explained that Satterfield had admitted to disposing of his .44 caliber gun—the purported murder weapon—shortly after the killing, only to later tell police the firearm had been stolen. According to the State Respondents, Mr. Edwards also testified to details of the crime that nobody beside the killer could have known; for instance, that the killer had fired four shots at the victim and that the victim was running away at the time he was struck.[4]

Satterfield took the stand in his own defense. He admitted that he had told Mr. Edwards that he was once suspected of murder and recounted to Mr. Edwards the details laid bare in the search warrants he had been served with during the investigation. But Satterfield insisted that Mr. Edwards had fabricated the rest of the confession, possibly prompted by a developing romantic relationship between Satterfield and Mr. Edwards' wife. Satterfield also testified that he had owned a .44 caliber special gun like the one used in Bryant's murder, but reaffirmed that it had been stolen in an unreported burglary years before the killing. He nonetheless admitted that he had

---

[4] We note, however, that the search warrants indicated four bullets were removed from Bryant's body. (J.A. 708.)

7

purchased .44 special ammunition on the very day that he was assaulted by Bryant.

Satterfield was represented by attorney Lee Mandell at his murder trial. Mandell did not call either of the Freeman brothers as witnesses, nor did Mandell even interview either of the brothers prior to trial.[5] Instead, the only mention of either brother's eyewitness statement came when Satterfield read Eric Freeman's description of the suspect from a search warrant affidavit. The jury convicted Satterfield of first degree murder in June 1985.

After his conviction, Satterfield filed post-verdict motions alleging that Mandell was ineffective for failing to present the Freemans as defense witnesses at trial. The trial court held an evidentiary hearing during which it heard testimony from Mandell and both Freeman brothers. Eric Freeman repeated his earlier description of the suspect as a white man with blonde hair. (J.A. 642.) Grady Freeman, however, took the opportunity to clarify his initial description of the suspect as having "light skin," now explaining that the suspect was "Caucasian" and had light blonde hair. (J.A. 620.) He further proclaimed that he was "positive" Satterfield was not the man he had seen at the time of the shooting. (J.A. 620.) Importantly, there was some sparring at the evidentiary hearing over whether Grady's initial statement to police that the

---

[5] Mandell testified his investigator had encountered difficulty tracking the Freeman brothers down. Both brothers, however, responded to the State's subpoena to appear for the trial. Satterfield's initial post-trial counsel, Ms. Gelb, also had no problem locating the brothers and easily procuring their appearance at the post-trial motion hearing.

suspect was light-skinned meant that the suspect had lighter black skin or was white. (J.A. 612.)

Following the evidentiary hearing, the trial court dismissed Satterfield's post-verdict motion and sentenced him to life imprisonment. The Pennsylvania Superior Court then denied his appeal, determining that that Mandell had pursued a valid trial strategy in attempting to avoid a rebuttal of Eric's favorable description of the suspect with Grady's initial statement. (J.A. 675.) But the Superior Court's conclusion relied on its observation that Grady Freeman had identified the fleeing man "as a 'light-skinned' black male, with cut short hair, in his early thirties," a description which "closely fit that of Satterfield." (J.A. 674.) Later, the District Court presiding over Satterfield's habeas proceedings would point out that the Superior Court's characterization of Grady's statement was in error. Grady Freeman had never described the suspect as a "light-skinned black male," but merely as "light-skinned." Nonetheless, the Pennsylvania Supreme Court denied allocatur.

Satterfield next filed a *pro se* King's Bench petition with the Pennsylvania Supreme Court in 1996. This petition was denied, along with his petition for reconsideration. Satterfield's 1997 *pro se* PCRA petition was also denied, and his appeals were unsuccessful.

In 2002—almost 20 years after Bryant's murder—Satterfield filed a federal habeas petition raising nine claims, including actual innocence and ineffective assistance of trial counsel for failing to present the Freemans as witnesses. A Magistrate Judge initially recommended the petition be dismissed as time-barred. After finding that Satterfield's King's Bench petition was a "properly filed" application for

9

state post-conviction review, the District Court remanded the petition to the Magistrate Judge for further analysis of the timeliness issue and the merits of Satterfield's claims. The Magistrate Judge then issued a supplemental report recommending Satterfield's claims be denied on their merits, which the District Court initially adopted. But after Satterfield's objections, the District Court granted relief on his ineffective-assistance-of-counsel claim. The District Court concluded that the Pennsylvania Superior Court's determination that Mandell had a reasonable basis in not putting forth the Freemans' testimony was based, as mentioned earlier, on a misreading of Grady Freeman's statement. *Satterfield v. Johnson*, 322 F. Supp. 2d 613, 620, 623–24 (E.D. Pa. 2004). The District Court, however, adopted the supplemental report and recommendation of the Magistrate Judge denying relief on Satterfield's other claims. *Id.* at 624.

The State Respondents appealed the District Court's decision, arguing that Satterfield's petition should be dismissed as time-barred. We reversed and remanded, finding that Satterfield's King's Bench petition to the Pennsylvania Supreme Court was not a "properly filed" collateral challenge to his conviction for the purposes of 28 U.S.C. § 2244(d)(2), and thus did not toll AEDPA's statute of limitations. *Satterfield v. Johnson*, 434 F.3d 185, 195 (3d Cir. 2006). We also determined that Satterfield was not entitled to equitable tolling. *Id.* at 196. Upon remand, the District Court dismissed Satterfield's petition.

In 2014, approximately 30 years after Satterfield's arrest in connection with Bryant's murder, he filed a motion with the District Court under Federal Rule of Civil Procedure 60(b)(6) seeking relief from the judgment dismissing his habeas petition. Satterfield argued that the Supreme Court's

10

holding in *McQuiggin* was a change in decisional law that served as an extraordinary circumstance upon which Rule 60(b)(6) relief may issue. *McQuiggin* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" to overcome an untimely petition under AEDPA. 133 S. Ct. at 1928. Upon review, the District Court ruled that *McQuiggin* was not a ground for relief and denied the Rule 60(b)(6) motion. Satterfield then requested a Certificate of Appealability, which we granted on the issue of whether *McQuiggin*, either alone or in combination with other equitable factors, is sufficient to invoke relief from final judgment under Rule 60(b)(6) to allow an appellant to raise an otherwise time-barred valid claim that trial counsel was ineffective.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C § 2241 and § 2254. We have appellate jurisdiction under 28 U.S.C. § 1291 and § 2253. We review the District Court's denial of Satterfield's Rule 60(b)(6) motion for abuse of discretion. *Cox v. Horn*, 757 F.3d 113, 118 (3d Cir. 2014). "A district court abuses its discretion when it bases its decision upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact." *Id.*

## III.

Satterfield invokes Federal Rule of Civil Procedure 60(b)(6) to seek relief from the District Court's judgment dismissing his habeas petition. Rule 60(b) provides litigants with a mechanism by which they may obtain relief from a final judgment "under a limited set of circumstances including

11

fraud, mistake, and newly discovered evidence." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). Satterfield specifically relies upon Rule 60(b)(6), a catch-all provision extending beyond the listed circumstances to "any other reason that justifies relief." Despite the open-ended nature of the provision, a district court may only grant relief under Rule 60(b)(6) in "extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Cox*, 757 F.3d at 120 (quoting *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993)); *see also Boughner v. Sec'y of Health, Ed. & Welfare*, 572 F.2d 976, 978 (3d Cir. 1978). This is a difficult standard to meet, and "[s]uch circumstances will rarely occur in the habeas context." *Gonzalez*, 545 U.S. at 535.

Satterfield asserts in his Rule 60(b)(6) motion that a change in relevant decisional law occurring after his petition had been denied is an extraordinary circumstance upon which his Rule 60(b)(6) relief may issue. Satterfield identifies the Supreme Court's ruling in *McQuiggin*—handed down seven years after the District Court dismissed Satterfield's habeas petition on remand—as an intervening change in relevant decisional law that requires such relief. *McQuiggin* focused on the "fundamental miscarriage of justice" exception, a doctrine that had previously been applied to allow a habeas petitioner "to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief" where the petitioner makes "a credible showing of actual innocence." 133 S. Ct. at 1931. The Supreme Court clarified that the fundamental miscarriage of justice exception would also permit a petitioner to overcome a petition that failed to comply with AEDPA's statute of limitations. Even so, a petitioner asserting actual innocence may not avail himself of the exception "unless he persuades the district court that, in

light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 1928, 1935 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

The decision in *McQuiggin* is particularly relevant to Satterfield's case because we reversed his successful ineffective assistance of counsel claim after finding that his petition was untimely under AEDPA. Had *McQuiggin* been in place at the time of Satterfield's habeas proceedings, an appropriate showing of actual innocence may have allowed Satterfield to overcome his untimely petition and pursue his ineffective assistance claim. Thus, we must determine whether *McQuiggin* is a change in decisional law that can serve as an extraordinary circumstance upon which Rule 60(b)(6) relief may issue, either on its own or when paired with the equitable circumstances of the case.

## A.

Satterfield properly characterizes *McQuiggin* as effecting a change in our decisional law. Prior to *McQuiggin*, we had never affirmatively held that a showing of actual innocence could serve as an equitable exception to AEDPA's one-year statute of limitations. In fact, several circuits were split on the issue of whether such an equitable exception or basis for equitable tolling existed at the time *McQuiggin* was decided. *Compare Rivas v. Fischer*, 687 F.3d 514, 548 (2d Cir. 2012) (a compelling claim of actual innocence may excuse an otherwise untimely habeas petition); *Lee v. Lampert*, 653 F.3d 929, 934 (9th Cir. 2011) (en banc) (same); *San Martin v. McNeil*, 633 F.3d 1257, 1267–68 (11th Cir. 2011) (same); *Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010) (same); and *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005)

13

(same), *with David v. Hall*, 318 F.3d 343, 347 (1st Cir. 2003) (a showing of actual innocence does not excuse an otherwise untimely filing of a habeas petition); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (same); and *Escamilla v. Jungwirth*, 426 F.3d 868, 871–72 (7th Cir. 2004) (same).

We had numerous opportunities to confront habeas petitioners' arguments that their actual innocence should permit an equitable exception to, or equitable tolling of,[6] the statute of limitations. In each case, we declined to decide whether a showing of actual innocence could provide a basis for an equitable exception or equitable tolling in the habeas context and instead opted to sidestep the issue by determining that the petitioners had failed to establish actual innocence. *See, e.g.*, *Munchinski v. Wilson*, 694 F.3d 308, 329 n.16 (3d Cir. 2012) (noting that other circuits were split on the existence of an actual innocence exception, but declining to consider the issue because the petitioner had shown the diligence and extraordinary circumstances sufficient for equitable tolling); *Scott v. Lavan*, 190 F. App'x 196, 199 (3d Cir. 2006) (declining to consider whether an actual innocence exception exists because the petitioner had no basis to assert a claim of actual innocence); *Hussmann v. Vaughn*, 67 F. App'x 667, 669 (3d Cir. 2003) (same); *see also Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012) (avoiding the question of whether actual

---

[6] The Supreme Court explained in *McQuiggin* that there is a distinction between equitable tolling, where a petitioner seeks an extension of the prescribed statutory period to file, and an equitable exception, which would permit a petitioner to override the statute of limitations. 133 S. Ct. at 1931; *see also Rivas*, 687 F.3d at 547 n.42 (distinguishing between equitable tolling and equitable exceptions).

14

innocence allowed for equitable tolling, and instead finding the petitioner's showing of actual innocence to be inadequate); *Teagle v. Diguglielmo*, 336 F. App'x 209, 212 (3d Cir. 2009) (same); *Knecht v. Shannon*, 132 F. App'x 407, 409 (3d Cir. 2005) (same). While Satterfield could have looked to other circuits to make an equitable-exception argument at the time his petition was denied, actual innocence had not yet been established as a basis for an equitable exception to untimely filing under AEDPA in our circuit.[7]

**B.**

We turn next to whether the change in law borne by *McQuiggin* may properly serve as the basis of a Rule 60(b)(6) motion. Precedent makes clear that changes in decisional law alone will "rarely" constitute "extraordinary circumstances" for purposes of a Rule 60(b) motion. *Cox*, 757 F.3d at 121. Satterfield's reliance on an intervening change in the law is hardly novel in the habeas context, and petitioners have had little success with such arguments. The Supreme Court's decision in *Gonzalez v. Crosby* is a prime example of the difficulty of pursuing a Rule 60(b)(6) motion premised on a change in law. In *Gonzalez*, a district court had denied a prisoner's habeas petition on statute of limitations grounds. The prisoner later sought Rule 60(b)(6) relief, arguing that the Supreme Court's intervening decision in *Artuz v. Bennett*, 531 U.S. 4 (2000), marked a change in the interpretation of

---

[7] Satterfield did argue that actual innocence should allow for equitable tolling at the time of his petition.

15

AEDPA's statute of limitations.[8] *Gonzalez*, 545 U.S. at 536. The Court affirmed the denial of the prisoner's Rule 60(b)(6) motion, emphasizing that the district court's initial ruling on the timeliness of the petition was consistent with the Eleventh Circuit's then-prevailing interpretation of the statute. In that sense, the Court observed, "[i]t is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation," and "[a]lthough [the Court's] constructions of federal statutes customarily apply to all cases then pending on direct review, not every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final." *Id.* (citation omitted).

Both the State Respondents and the District Court interpret *Gonzalez* as foreclosing Rule 60(b)(6) relief in Satterfield's case. They conclude that the change in law brought about by *McQuiggin*—or any change in habeas law for that matter—cannot serve as an extraordinary circumstance justifying Rule 60(b)(6) relief. But *Gonzalez* does not mean that a change in law may never serve as the basis for Rule 60(b)(6) relief. *See Cox*, 757 F.3d at 123 ("*Gonzalez* did not say that a new interpretation of the federal habeas statutes— much less, the equitable principles invoked to aid their enforcement—is *always* insufficient to sustain a Rule 60(b)(6) motion."). Rather, *Gonzalez* leaves open the possibility that a

---

[8] The Supreme Court in *Artuz* held "that an application for state postconviction relief can be 'properly filed' even if the state courts dismiss it as procedurally barred." *Gonzalez*, 545 U.S. at 527.

16

change in law may—when accompanied by appropriate equitable circumstances—support Rule 60(b)(6) relief.[9]

---

[9] The State's brief and District Court's opinion cite several Eastern District of Pennsylvania decisions holding that the change in law in *McQuiggin* is not an "extraordinary circumstance" that can support a 60(b)(6) motion. *See, e.g.*, *Garcia v. Varner*, Civ. A. No. 00-3668, 2014 WL 2777398, at *4 (E.D. Pa. June 19, 2014); *Williams v. Patrick*, Civ. A. No. 07-776, 2014 WL 2452049, at *6 (E.D. Pa. June 2, 2014); *Pridgen v. Shannon*, Civ. A. No. 00-4561, 2014 WL 1884919, at *3 (E.D. Pa. May 12, 2014); *Akiens v. Wynder*, Civ. A. No. 06-5239, 2014 WL 1202746, at *2–3 (E.D. Pa. Mar. 24, 2014). All of these decisions compare *McQuiggin* to *Gonzalez*, noting that both represent a change in decisional law based on the interpretation of the federal habeas statute of limitations. As in *Gonzalez*, these courts found that *McQuiggin* was not sufficient to be an extraordinary circumstance. We later explain that *McQuiggin* is not merely a change in the procedural law governing the statute of limitations in habeas cases, as *Gonzalez* was. But to the extent that *McQuiggin* and *Gonzalez* are similar, our decision in *Cox*, emphatically rejects the notion that a particular change in law is never an extraordinary circumstance. Notably, all of these district court cases were decided before *Cox* was issued, and none engage in a thorough examination of the case-specific equities.

The State Respondents also cite several cases from other circuits, all of which were rendered before *Cox*. *See, e.g.*, *Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014); *Ryburn v. Ramos*, No. 09-cv-1176, 2014 WL 51880, at *2–3 (C.D. Ill. Jan. 7, 2014); *Rodgers v. Pfister*, No. 11-3120, 2013 WL

17

Our decision in *Cox*, rendered almost ten years after *Gonzalez*, further confirms that our Circuit has "not embraced any categorical rule that a change in decisional law is never an adequate basis for Rule 60(b)(6) relief." *Id.* at 121–22. Instead, we have consistently taken the position "that intervening changes in the law *rarely* justify relief from final judgments under 60(b)(6)." *Id.* (emphasis in original). Rather than impose any *per se* or bright-line rule that a particular change in law is never an extraordinary circumstance, we adhere to a "case-dependent analysis" rooted in equity. *Id.* at 124. This analysis manifests as a "flexible, multifactor approach to Rule 60(b)(6) motions . . . that takes into account all the particulars of a movant's case," even where the proffered ground for relief is a post-judgment change in the law.[10] *Cox*, 757 F.3d at 122.

---

5745835, at *2 (C.D. Ill. Oct. 23, 2013). Indeed, the Fifth Circuit decision in *Tamayo* relies on an earlier decision in *Adams v. Thayler*, 679 F.3d 312, 320 (5th Cir. 2012), which we explicitly declined to adopt in *Cox*. 757 F.3d at 121.

[10] We have explained that district courts should examine, "*inter alia*, [1] the general desirability that a final judgment should not be lightly disturbed; [2] the procedure provided by Rule 60(b) is not a substitute for an appeal; [3] the Rule should be liberally construed for the purpose of doing substantial justice; [4] whether, although the motion is made within the maximum time, if any, provided by the Rule, the motion is made within a reasonable time; ... [5] whether there are any intervening equities which make it inequitable to grant relief; [6] any other factor that is relevant to the justice of the [order] under attack...." *Lasky v. Cont'l Prods.*

In this context, we opt for more analysis of the equitable circumstances at play in Satterfield's case. The District Court concluded that the change of law in *McQuiggin* was not an extraordinary circumstance that could support Rule 60(b)(6) relief. As best we can tell, it incorrectly focused on whether *McQuiggin*, in isolation, was sufficient to serve as an extraordinary circumstance. *Cox*, on the other hand, requires a district court to consider the full panoply of equitable circumstances before reaching its decision. Whenever a petitioner bases a Rule 60(b)(6) motion on a change in decisional law, the court should evaluate the nature of the change along with all of the equitable circumstances and clearly articulate the reasoning underlying its ultimate determination. Thus we remand.

We will vacate the order of the District Court as it relates to Satterfield's Rule 60(b)(6) motion and remand to it to carry out another analysis. The task of weighing the equitable factors in order to grant or deny a Rule 60(b)(6) motion is "left, in the first instance, to the discretion of a district court." *Cox*, 757 F.3d at 124. Should the District Court grant Satterfield's motion, he will be permitted to pursue his meritorious ineffective-assistance-of-counsel claim once more.

## IV.

While the District Court must take the first pass at weighing the equitable factors involved in Satterfield's Rule 60(b)(6) motion, we emphasize that the nature of the change in

*Corp.*, 804 F.2d 250, 256 (3d Cir. 1986) (quoting *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977)).

decisional law itself must be a factor in the analysis. The principles underlying the Supreme Court's decision in *McQuiggin* are fundamental to our system of government and are important to the inquiry on remand.

*McQuiggin* allows a petitioner who makes a credible showing of actual innocence to pursue his or her constitutional claims even in spite of AEDPA's statute of limitations by utilizing the fundamental-miscarriage-of-justice exception—an exception "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *McQuiggin*, 133 S. Ct. at 1931. Underlying the fundamental-miscarriage-of-justice exception is a "[s]ensitivity to the injustice of incarcerating an innocent individual," and the doctrine aims "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Id.* at 1932. For this reason, "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quoting *Engle v. Isaac*, 456 U.S. 109, 135 (1982)) (alteration in the original). The Supreme Court has underscored the importance of these principles, explaining that "concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" *Id.* at 325 (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).

20

The values encompassed by the fundamental-miscarriage-of-justice exception and which drive the Supreme Court's decision in *McQuiggin* cannot be divorced from the Rule 60(b)(6) inquiry. *Cox* requires a weighing of the equitable factors at play in a particular case, and the nature of the change in law itself is highly relevant to that analysis. *McQuiggin* illustrates that where a petitioner makes an adequate showing of actual innocence, our interest in avoiding the wrongful conviction of an innocent person permits the petitioner to pursue his constitutional claims in spite of the statute-of-limitations bar. This interest is so deeply embedded within our system of justice that we fail to see a set of circumstances under which this change in law, paired with a petitioner's adequate showing of actual innocence, would not be sufficient to support Rule 60(b)(6) relief in this context.[11] Put another way, a proper demonstration of actual innocence by Satterfield should permit Rule 60(b)(6) relief unless the totality of equitable circumstances ultimately weigh heavily in the other direction. A contrary conclusion would leave open the possibility of preventing a petitioner who can make a credible showing of actual innocence from utilizing the fundamental-miscarriage-of-justice exception simply because we had not yet accepted its applicability at the time his petition was decided—an outcome that would plainly betray the principles upon which the exception was built. Such an outcome would also implicate two factors of the Rule 60(b)

[11] This also marks the key difference between *McQuiggin* and *Gonzalez*, where the change in law was a statutory interpretation of AEDPA's statute of limitations, not an equitable exception to the statute's procedural requirements.

21

analysis recently identified by the Supreme Court: "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). Thus, if a petitioner can make a showing of actual innocence, *McQuiggin*'s change in law is almost certainly an exceptional circumstance.[12]

Given this observation about the importance of the change in law effected by *McQuiggin* and the weight it should carry in the equitable analysis, a court should focus its efforts primarily on determining whether Satterfield has made an adequate showing of actual innocence to justify relief. The change in law brought about by *McQuiggin* will only permit him to overcome his time-barred petition if he can make a credible showing of actual innocence—a burdensome task that requires a petitioner to "persuade[] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 133 S. Ct. at 1928, 1935 (quoting *Schlup*, 513 U.S. at 329). Thus, the miscarriage-of-justice exception and *McQuiggin*'s holding more broadly will not be applicable to Satterfield's case if he cannot make a proper showing of actual innocence, and the District Court must determine whether such a showing has been made as a threshold matter. We leave this inquiry entirely to the District Court on remand, and recognize that the issue may require an evidentiary hearing during which other equitable factors may come into play.

---

[12] Because the equitable circumstances must be balanced, we acknowledge that, just as there may be facts that strengthen the determination that a change in law is extraordinary, there could also be a set of heavily unfavorable facts that require a different outcome.

22

Among these additional equitable factors, the District Court may consider Satterfield's meritorious ineffective-assistance-of-counsel claim. The Supreme Court's recent decision in *Buck v. Davis* established that the severity of the underlying constitutional violation is an equitable factor that may support a finding of extraordinary circumstances under Rule 60(b)(6). The appellant in *Buck* sought to vacate the court's judgment so he could present an otherwise defaulted claim of ineffective assistance of trial counsel. 137 S. Ct. at 777–79.

*McQuiggin* also makes relevant whether Satterfield raises a colorable claim of ineffective assistance of trial counsel, as the actual innocence exception only provides a gateway for courts to review a petitioner's separate claim of constitutional error. *See McQuiggin*, 133 S. Ct. at 1931; *see also Schlup*, 513 U.S. at 316–17 (noting that petitioners seeking habeas relief carry less of a burden when their convictions are the result of unfair proceedings—and the actual innocence threshold standard applies—than when they have been convicted after a fair trial). Because Satterfield's claim of constitutional error—counsel's unreasonable failure to investigate and present exculpatory eyewitness testimony—is the reason why the actual innocence exception could apply to his case, the gravity of that error bears on the weight of his *McQuiggin* claim.

In previously granting Satterfield's ineffective-assistance claim, the District Court concluded that Satterfield's counsel was ineffective in failing to call the Freeman brothers as witnesses or otherwise to present their testimony, and that counsel's error prejudiced Satterfield. Such a finding of constitutionally deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), is rare. Thus, the District

23

Court may consider weighing this factor in favor of finding extraordinary circumstances.

Because the District Court is ruling on a Rule 60(b) motion in the habeas context, it may also account for the "[p]rinciples of finality and comity, as expressed through AEDPA and habeas jurisprudence" by "consider[ing] whether the conviction and initial federal habeas proceeding were only recently completed or ended years ago." *Cox*, 757 F.3d at 125. When more time has elapsed since the final conviction, a court will give more weight to the state's interest in finality.

The Supreme Court, however, has established that considerations of finality and comity must yield to the fundamental right not to be wrongfully convicted. *See House v. Bell*, 547 U.S. 518, 536–37 (2006); *Schlup*, 513 U.S. at 320–21 (citing *Murray*, 477 U.S. at 496); *cf. Calderon v. Thompson*, 523 U.S. 538, 557 (1998) ("In the absence of a strong showing of 'actual innocence,' the State's interests in actual finality outweigh the prisoner's interest in obtaining yet another opportunity for review." (citation omitted)). Hence the District Court should give less weight to these factors when a petitioner asserts a threshold claim of actual innocence. The fact that Satterfield's state proceeding ended a decade ago should not preclude him from obtaining relief under Rule 60(b) if the court concludes that he has raised a colorable claim that he meets this threshold actual-innocence standard and that other equitable factors weigh in his favor.

As we have explained, though, the weighing of the equitable factors in this case belongs to the District Court in the first instance. Though we have pointed out the importance of the change in *McQuiggin* and its weight in the Rule 60(b)(6) analysis—as well as several other equitable factors for

24

consideration—we express no opinion on the final outcome. The District Court is best positioned to carry out this analysis.

## V.

For the foregoing reasons, we will vacate the April 16, 2015 order of the District Court with respect to the denial of Satterfield's request for Rule 60(b)(6) relief and remand for reconsideration of the whether the change of law wrought by *McQuiggin*, combined with the other circumstances of the case, merits relief under Rule 60(b)(6).